**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DANIEL MASTERSON,<br><br>        Plaintiff,<br><br>    v.<br><br>S. KILLEN, et al.,<br><br>        Defendants. | No.  1:11-cv-01179-DAD-SAB (PC)<br><br>FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(ECF No. 90)<br><br>**THIRTY-DAY DEADLINE** |

Plaintiff Daniel Masterson is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This case proceeds against Defendants Killen, Hampson, Hall, Fisher, Rodriguez, Santoro, and Tolson for retaliation in violation of the First Amendment, and against Defendants Killen, Hampson, Hall, Rodriguez, Santoro, and Tolson for conspiracy to retaliate against Plaintiff. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(1)(B) and Local Rule 302.[1]

Currently before the Court is Defendants' motion for summary judgment, filed on June 10, 2016 (ECF No. 90.)

///

---

[1] Defendant Hampson was sued under her former name, "Velva Rowell."

# I.

## RELEVANT HISTORY

This action proceeds on the third amended complaint, filed on November 22, 2013, against Defendants Killen, Hampson, Hall, Fisher, Rodriguez, Santoro, and Tolson for retaliation in violation of the First Amendment, and against Defendants Killen, Hampson, Hall, Rodriguez, Santoro, and Tolson for conspiracy to retaliate against Plaintiff. (ECF No. 28.)

On November 7, 2014, Defendants filed an answer to the third amended complaint. (ECF No. 38.) On November 14, 2014, a discovery and scheduling order was issued, (ECF No. 42), which was modified on July 16, 2015, (ECF No. 56).

As noted above, on June 10, 2016, Defendants filed the subject motion for summary judgment. (ECF No. 90.) Following certain extensions of time, on September 19, 2016, Plaintiff filed an opposition, with support. (ECF Nos. 100, 101, 102, 103, 105.)

Following their own extensions of time and other matters, on December 2, 2016, Defendants filed a reply to Plaintiff's opposition. (ECF No. 117.) Among the arguments in their reply brief, Defendants assert that Plaintiff submitted forged and fraudulent declarations in support of his opposition. (ECF No. 117, pp. 2, 12-13.) Defendants moved to strike the allegedly false and fraudulent declarations.

On December 14, 2016, Defendants moved for an order requiring Plaintiff to show cause why he should not be sanctioned for preparing and filing the allegedly false declarations. Defendants further requested a show cause hearing. (ECF No. 118.) Plaintiff contended that no false declarations were filed, and did not oppose the show cause hearing. (ECF Nos. 120, 123.)

On December 14, 2016 Plaintiff filed a motion to stay the proceedings in this matter to resolve the dispute regarding the declarations, which he contends were not false or fraudulent. (ECF No. 120.) On December 21, 2016, Defendants filed a response to Plaintiff's motion, agreeing that the issues regarding the declarations should be resolved before the case proceeds. (ECF No. 121.)

Following other submission by the parties on these matters, on January 26, 2017, the Court set this matter for an evidentiary hearing. (ECF No. 28.) The evidentiary hearing was held on February 15, 2017. (ECF No. 139.) Concurrently with this order, the undersigned issued findings and

recommendations regarding Defendants' motion to strike certain declarations and the cross-motions for sanctions by the parties. As set forth in that order, the undersigned recommended that each of the two typed declarations Plaintiff filed from inmate McCollum, (ECF No. 100, pp. 177-78, 202-04) in support of his opposition to Defendants' motion for summary judgment, should be stricken from the record and not considered for purposes of that motion. No other sanctions were recommended.

Defendant's motion for summary judgment is now deemed submitted for review, without oral argument. Local Rule 230(l).

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at this recommendation, the Court has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

### III.

### DISCUSSION

**A.      Summary of Third Amended Complaint**

The events at issue in the third amended complaint allegedly occurred at the California Substance Abuse Treatment Facility and State Prison ("SATF") in Corcoran, California, when Plaintiff was incarcerated there. All of the defendants were employed by the CDCR at the time of the events at issue.

Plaintiff's claims arise from events occurring between July 6, 2010 and May 4, 2012 at SATF.[2] In July 2010, Plaintiff filed a grievance against Defendants Killen and Hampson for refusing to process Plaintiff's legitimate request for copies related to pending litigation which defendant Killen referred to as a "bullsh-- lawsuit against custody staff." (Third Amended Complaint ("3ACP"), ECF No. 28, at ¶ 1.) Shortly thereafter, Defendants Killen and Hampson—with the assistance and approval of Defendants Rodriguez and Hall—caused Plaintiff to be removed from his paid position as a library clerk and reassigned to a non-paid, less desirable position on the yard crew picking up trash. Plaintiff alleges that there was no legitimate penological reason for the change in his position. Plaintiff filed an inmate grievance concerning this retaliation.

On August 18, 2010, during an interview about the retaliation, Defendant Hall threatened Plaintiff with "unfavorable consequences" if Plaintiff revealed any part of the interview in any complaints filed against Defendant Killen. (3ACP, at ¶ 4.)

---

[2] On March 8, 2013, Plaintiff was granted leave to supplement the complaint by adding related "allegations of incidents occurring [after the date the initial complaint for this action was filed,] between August 11, 2011 and August 29, 2012." (ECF No. 23, at p. 3.)

On September 14, 2010, Plaintiff was interviewed by an appeals coordinator about Plaintiff's reassignment from his library clerk position to his assignment on the yard crew. The appeals coordinator told Plaintiff that pursuant to state regulations, Defendants Killen, Hampson, Hall and Rodriguez could not remove Plaintiff from a paid position to a non-paid position "absent disciplinary action or some kind of documentation requesting action be taken by a classification committee." (3ACP, at ¶ 7.) Defendants had not submitted any of the required documentation. The appeals coordinator told Plaintiff that CCR Title 15 creates a "liberty interest" requiring "Due Process" under the Fourteenth Amendment. (Id.)

On September 30, 2010, Defendant Killen refused Plaintiff access to the law library to conduct legal research and obtain needed legal copies. When Plaintiff asked why he was being denied access, Defendant Killen said, "You haven't figured out you can't 602 [file a complaint against] us?" (3ACP, at ¶ 5.)

On October 5, 2010, Plaintiff was interviewed by Defendant Hampson about Defendant Killen's retaliatory actions and harassment of Plaintiff. Defendant Hampson stated that she was in "collaboration" with any actions done by Defendant Killen, including denying Plaintiff copies and access to the law library. (3ACP, at ¶ 6.)

On January 27, 2011, Defendant Hampson informed Plaintiff that she and Defendant Killen were well aware that Plaintiff was preparing to file a § 1983 lawsuit against them, which made it necessary for her and other defendants to have "collusion" between them. (3ACP, at ¶8.) Plaintiff acknowledged that he intended to file a lawsuit because of the retaliation.

On February 15, 2011, Defendant Hampson wrote the first of several adverse chronos [reports] against Plaintiff, in collusion with Defendant Killen. Defendant Hampson documented that she was "in fear [that Plaintiff] can make her [Defendant Killen] lose her temper so that he will have a real reason to file a lawsuit against her," insinuating that Defendant Killen has a history of losing her temper, resulting in a pattern of retaliation. (3ACP, at ¶ 9.)

On May 7, 2011, Defendant Killen threatened Plaintiff by stating that if he filed any more complaints against her or pursued any pending complaints, "I'll have you thrown in the hole and transferred. You know I can do it too." (3ACP, at ¶ 10.)

On May 20, 2011, Defendant Hampson authored her second adverse chrono, alleging that Plaintiff's request to have Defendant Killen cease her retaliatory actions was Plaintiff "attempting to be overfamiliar with LTA Killen." (3ACP, at ¶ 11.) Defendant Hampson knew that using the word "overfamiliar" would automatically cause Plaintiff to be re-housed in administrative segregation (Ad-Seg), under the guise of an investigation. (Id.) Defendant Fisher ordered Defendant Hampson to recant the use of the word "overfamiliar" as it was false and Defendant Hampson's intentions too obvious. (Id.) Defendant Hampson was forced to document the resentment.

On June 24, 2011, Defendant Killen attempted to intimidate Plaintiff via institutional mail by indicating that Defendants were going to illegally take money from Plaintiff's prison trust account by falsely claiming that Plaintiff did not return legal cases. When Plaintiff produced evidence that the legal cases were in fact returned, Defendant Killen responded with an adverse chrono.

On June 28, 2011, Defendant Hall interviewed Plaintiff about a grievance filed alleging that Defendants Killen, Hampson, and Hall had attempted to discourage Plaintiff from filing federal litigation. Defendant Hall told Plaintiff that he was also in collusion with Defendants Killen and Hampson. Defendant Hall inadvertently left incriminating handwritten notes taken during the interview, attached to the appeal when the appeal was returned to Plaintiff, revealing a collusion and conspiracy among the defendants.

On July 12, 2011, Plaintiff presented documentation to Defendant Killen showing that Plaintiff had a court-ordered deadline and needed to obtain copies. Defendant Killen refused and stated, "602 that!" (3ACP, at ¶ 15.) When Plaintiff stated that a complaint would be filed, Defendant Killen said that Plaintiff would receive yet another retaliatory disciplinary report. Killen followed through with the threat, issuing Plaintiff a disciplinary report. Plaintiff subsequently missed the court deadline and was not permitted to file a reconsideration motion. (Id.)

On July 13, 2011, Defendant Fisher threatened Plaintiff by stating, "You had better back off with the appeals," referring to the complaints filed against Defendants Killen, Hampson, and Hall. (3ACP, at ¶ 14.)

On August 11, 2011, at the request of Defendant Hampson and on the orders of Defendant Santoro, Defendant Rodriguez threatened to throw Plaintiff in the hole if Plaintiff filed any further

complaints or pursued any pending complaints or litigation. On August 16, 2011, Plaintiff filed a motion for a protective order with this court.

On August 24, 2011, Plaintiff was interviewed for a second time by appeals coordinator R. M. Hall, regarding Plaintiff's appeal about his change in job assignment. The appeals coordinator stated that Defendants Killen, Hampson, Hall, and Rodriguez could not reassign Plaintiff without due process and definitely not in retaliation for Plaintiff filing a complaint. On September 14, 2011, the appeals coordinator provided Plaintiff with information and documentation to support this contention.

On September 9, 2011, during an interview with Plaintiff, Defendant Hampson admitted that she did in fact contact Defendant Rodriguez on or about August 11, 2011, requesting Defendant Rodriguez to persuade Plaintiff from filing any further complaints and to abandon pending litigation.

On October 11, 2011, Defendant Killen authored a fourth disciplinary chrono in retaliation for Plaintiff's litigation against Defendant Killen. The chrono alleged that Plaintiff had returned case law documents directly to the Education Principal instead of to Defendant Killen. There was no actual violation of any prison rule or regulation involved.

On October 18, 2011, Defendant Killen authored another adverse disciplinary chrono after "literally stalk[ing]" Plaintiff by searching the prison yard to locate him, documenting that Plaintiff was standing with a group of prisoners "laughing." (3ACP, at ¶ 20.)

Defendant Hampson issued three adverse chronos and Defendant Killen at least seven, with absolutely no legitimate penological goal.

On November 16, 2011, Plaintiff asked Defendant Santoro why he ordered Defendant Rodriguez to threaten Plaintiff with being thrown in the hole for maintaining litigation, and asked whether Defendant Santoro was going to address the ongoing harassment and retaliation by Defendants Killen and Hampson. Defendant Santoro became visibly agitated and briskly walked away.

On December 17, 2011, Defendant Killen issued Plaintiff a ducat to report to the law library. Plaintiff was escorted by two officers. Defendant Killen opened the library door and told Plaintiff and the officers that she and her clerk (Inmate Waymon Berry) were the only two in the library. One of the officers asked Defendant Killen how many prisoners were ducated for that day, and Defendant Killen

replied only the Plaintiff. The officer and Plaintiff found this to be extremely odd and suspect. Due to Defendant Killen's past threats to Plaintiff, Plaintiff was not comfortable entering the library with only Defendant Killen and her clerk. Defendant Killen became angry and informed Plaintiff and the officer that she would be issuing Plaintiff a serious disciplinary report for refusing to enter the library.

On December 27, 2011, according to Plaintiff's housing unit staff, Defendant Killen ordered housing unit officers to search Plaintiff's cell and confiscate items that Plaintiff used to prepare legal documents. The cell was left in disarray with documents thrown about the cell. There was no penological reason for the cell search and confiscation of property.

On December 30, 2011, Defendant Killen's clerk, Inmate Berry, threatened Plaintiff by stating that he would provide false information to prison officials implicating Plaintiff and claim Plaintiff as an enemy, if Plaintiff refused to dismiss the pending litigation against Defendant Killen. This threat would cause Plaintiff to be re-housed in Ad-Seg under investigation. Plaintiff wrote a declaration, under penalty of perjury, about the threats and sent it to Defendant Cordova, with copies to other prison officials. Defendant Cordova failed to act on the threats against Plaintiff.

On January 7, 2012, Inmate Berry issued Plaintiff an ultimatum, with Defendant Killen's knowledge and support. Inmate Berry said if Plaintiff did not drop the litigation and complaints against Defendant Killen, he would be thrown in the hole based on false information.

On January 8, 2012, Plaintiff was informed by prison officials that Inmate Berry had submitted confidential information, which resulted in Plaintiff being placed in Ad-Seg under investigation. (3ACP, at ¶ 27.)

On January 12, 2012, Defendant Tolson confirmed during an interview with Plaintiff that Inmate Berry was behind Plaintiff being thrown in the hole, and that Defendant Tolson was fully aware of the circumstances of Plaintiff's placement in Ad-Seg.

On January 19, 2012, Plaintiff's Ad-Seg counselor informed Plaintiff that Inmate Berry had not only provided the false information, but also claimed there was an "enemy situation" between him and Plaintiff. (3ACP, at ¶ 29.) The investigation into the false allegations against Plaintiff was completed on January 22, 2012, confirming that the information could not be substantiated. However, Defendants Tolson, Fisher, and Santoro ordered Plaintiff to be kept in Ad-Seg in further retaliation.

8

On January 23, 2012, Plaintiff received a CDCR-22 Inmate Request for Interview form with a written response from Defendant Cordova. Defendant Cordova acknowledged and admitted receiving Plaintiff's December 30, 2011 declaration. Defendant Cordova also admitted that she made Defendants Tolson and Fisher fully aware of the threats made and plot against Plaintiff by Inmate Berry, prior to Inmate Berry's actions. Defendants Tolson and Fisher failed to protect Plaintiff.

On January 25, 2012, Plaintiff's counselor informed him that Inmate Berry was housed in Ad-Seg and would be transferred to another institution, so there was no reason for Plaintiff not to be released back to the facility.

On February 1, 2012, Plaintiff's counselor informed him that he was ordered by Defendants Tolson and Fisher to keep Plaintiff in the hole and put Plaintiff up for transfer.

On February 2, 2012, Plaintiff attended a meeting in the Institutional Classification Committee (ICC) room. Defendant Santoro told Plaintiff that he could not be released from Ad-Seg because Defendant Tolson did not submit the Investigation Closure Report. Defendant Santoro said that Plaintiff could be transferred to Corcoran State Prison, inferring that even if the Closure Report had been submitted, Plaintiff would not have been released from the hole. It was later verified by Plaintiff's counselor and Defendant Tolson that Defendant Santoro conspired with other named Defendants to keep Plaintiff in the hole and transfer him in retaliation, and in fulfillment of her ordering Plaintiff threatened on August 11, 2011.

On February 3, 2012, during an interview about Plaintiff's appeal concerning her and Defendant Killen's retaliation, Defendant Hampson told Plaintiff she knew the circumstances behind why Plaintiff was re-housed in Ad-Seg. Defendant Hampson then stated, "Berry has been severely chastised for his actions." (3ACP, at ¶ 35.) She (Hampson) told Plaintiff he would never be able to prove that she or Defendant Killen had prior knowledge of Inmate Berry's plan.

On the evening of February 3, 2012, while waiting to be admitted to the prison's infirmary, Plaintiff was placed into a holding cage. Directly across from the cage was an observation room, and on the door was a sign reading "Ad-Seg" and Inmate Berry's name. Inmate Berry was housed in that room. Plaintiff had a brief conversation with Berry, in which Berry admitted his actions of having Plaintiff thrown in the hole under false pretenses, apologized to Plaintiff, and admitted that Defendant

9

Killen knew in advance of Berry's plan and had encouraged Berry on January 7, 2012 to execute the plan, stating something like, "That will fix his a--." (3ACP, at ¶ 36.) Defendant Killen conspired with Berry to have Plaintiff thrown into the hole and transferred for pursuing this lawsuit.

On February 8, 2012, Plaintiff's counselor informed him that although there was no legitimate reason to keep Plaintiff in Ad-Seg, Defendants Tolson and Fisher ordered Plaintiff not to be released from Ad-Seg.

On February 15, 2012, Plaintiff's counselor told him that it was Defendant Santoro who had ordered Defendants Tolson and Fisher to come up with a reason for Plaintiff's Ad-Seg confinement and transfer. The counselor stated that the order to keep Plaintiff in Ad-Seg and transfer him was directly related to Plaintiff's litigation against Defendants. The counselor also said that Inmate Berry's transfer had been rescinded and Berry would be released from Ad-Seg and returned to Delta Facility. This was done on Defendant Santoro's orders, forcing Plaintiff to remain in Ad-Seg pending transfer.

On February 27, 2012, while being escorted back to his cell, Plaintiff met up with Defendant Tolson who admitted that Defendant Santoro ordered that Plaintiff remain in Ad-Seg and be transferred. There was no penological reason for Plaintiff to remain in Ad-Seg. The only logical reason was to punish Plaintiff for maintaining litigation.

On March 1, 2012, Plaintiff was again brought before the ICC. Defendant Tolson was there as a member of the committee. Plaintiff demanded that it be put on the record that the ordered transfer was an obvious retaliatory transfer for Plaintiff maintaining a civil suit against prison officials. Defendant Tolson made a snide remark under his breath to Plaintiff, "We told you that you should have dropped the lawsuit." (3ACP, at ¶ 40.)

On March 2, 2012, Plaintiff submitted an inmate/parolee form alleging the retaliation and conspiracy to keep Plaintiff in Ad-Seg and transfer him.

On March 14, 2012, Defendant Tolson interviewed Plaintiff and gave him the January 19, 2012 CDC-114-D (Ad-Seg Placement Order) by Acting Chief Deputy Warden Tann. Defendant Tolson said the CDC-144-D was finally issued because of Plaintiff's letters of complaint to the Warden. This was a due process violation. Defendant Tolson admitted that the Investigation had been completed by January 22, 2012. When it was brought up that the pending lawsuit may be the motive

for the retaliation, Defendant Tolson made affirmative motions and stated that he was currently "named in five other pending lawsuits," as if he were proud of the fact and there was no way a court or jury would find him guilty of anything. (3ACP, at ¶ 42.)

On April 10, 2012, Plaintiff was transferred in retaliation from SATF to CSP-LAC (a more restrictive prison) as punishment, where he was immediately housed in Ad-Seg due to an alleged lack of bed space.

On May 4, 2012, Defendant Fisher, in response to an appeal, stated that on March 1, 2012, Defendant Tolson recommended the transfer and Defendant Gomez endorsed the transfer. Plaintiff contends that Defendant Gomez's action was part of a conspiracy with the other named Defendants.

**B.     Motion for Summary Judgment**

Defendants argue that Plaintiff's First Amendment retaliation claims fail because the undisputed facts show that their actions served legitimate prison purposes, were not motivated by Plaintiff's protected conduct, were not adverse, and did not chill his speech. Defendants also argue that Plaintiff's conspiracy claims fail because they are dependent on his failed First Amendment claims, and because they are conclusory and based on speculation. Finally, Defendants argue that they are entitled to qualified immunity.

1.     Undisputed and Disputed Material Facts

Few facts in this matter are undisputed. The parties agree that Plaintiff was incarcerated at SATF from July 2008 through April 10, 2012, and was a Level IV inmate while housed at SATF on Facility D. (Pl.'s Resp. to Defs.' Statement of Undisputed Facts ("Pl.'s Resp. to Defs.' SUF"), ECF No. 103, at ¶ 1.)

On September 5, 2009, Plaintiff began working as a clerk in the Facility D law library under Library Technical Assistant ("LTA") Mandel, a non-party. (Hampson Decl., ECF No. 114, at ¶ 5.)[3] In late-fall 2009, LTA Mandel was moved to a different facility because of issues regarding Facility D. Specifically, Facility D was experiencing a much higher-than-average number of photocopies being

---

[3] Plaintiff asserts that his job title changed through the course of his law library employment, from literacy clerk to law library clerk, but the parties agree that he began working in the law library as a clerk in some capacity in September 2009.

11

made, Preferred Legal User ("PLU") status was being granted when it was not appropriate, too many inmates were allowed in the library at one time, in contravention of Fire Marshal rules, and LTA Mandel was not providing appropriate supervision of the inmate library clerks. (Id.)

In the period between late-fall 2009 and mid-June 2010, there were approximately three or four LTAs assigned to Facility D. They all left the position for various reasons. Because of the transient state of the Facility D LTA position, the inmate clerks that were already assigned to Facility D continued in their positions. (Hampson Decl. ¶ 4.) During this time, LTAs from other facilities and other library staff would fill-in on Facility D to ensure that Facility D inmates were able to have access to the law library (Id. at ¶ 7.) Thus, Defendant Hampson, who was employed as the Senior Librarian for SATF during the relevant events, had occasion to work with Plaintiff. (Id. at ¶¶ 1, 7.)

Later, on or about June 19, 2010, Defendant Killen was assigned as the LTA for the Facility D law library. Defendant Killen reported to Defendant Hampson, and Plaintiff was assigned as one of her inmate clerks. (Pl.'s Resp. to Defs.' SUF ¶ 14.) Shortly after Defendant Killen was assigned to the Facility D library, on June 25, 2010, Facility D was placed on lockdown. (Id. at ¶ 15.) Plaintiff only worked with Defendant Killen for a few hours before the lockdown. (Id.)

On July 13, 2010, Plaintiff submitted an inmate grievance to Defendant Killen. (Killen Decl., ECF No. 90-9, at ¶ 7; CDCR Form 602 dated July 11, 2010, ECF No. 90-4, pp. 20-26.) Plaintiff complained in the grievance that Defendant Hampson exceeded her authority in denying Plaintiff's request for duplicating services, and in effect denied him access to the courts, or at least delayed his prosecution of certain litigation. (Id.) On July 14, 2010, Defendant Killen submitted a work change application for Plaintiff's job to be changed to a yard crew position. (Id. at ¶ 6, Ex. A.)

On or about July 18, 2010, Plaintiff submitted an inmate grievance alleging that Defendants Killen and Hampson retaliated against him for filing a complaint and maintaining a lawsuit by having him unassigned from his library clerk position to a less desirable assignment picking up trash. (Hall Decl., ECF No. 90-7, at ¶ 7, Ex. A.) Plaintiff continued to use the law library after he was reassigned to the yard crew position, and Defendant Killen regularly observed and interacted with him. (Killen Decl. ¶ 9.) Defendant Killen documented certain incidents involving Plaintiff on CDC 128B information chronos and CDC 128A counseling chronos, which were then placed in Plaintiff's central

file. Plaintiff did not lose any privileges based on any of these chronos. (Id.) Plaintiff also made complaints and brought inmate appeals about Defendant Killen regarding retaliation, harassment, and other issues. (ECF No. 100, pp. 72-73, 77-82, 83-84, 86.) This included a petition to have Defendant Killen removed from her position as the LTA of the Facility D. Law Library (Id. at pp. 77-82.) Over the next few months, Defendant Hampson also authored a CDC 128-B informational chronos regarding Plaintiff. (Hampson Decl. ¶¶ 14-16, Exs. B, C, D.)

On July 18, 2011, Plaintiff filed the initial complaint in this action, dated July 11, 2011, and commenced this lawsuit. (ECF No. 1.) A few weeks later, on August 11, 2011, Plaintiff was brought into the Facility D program office to meet with Defendant Rodriguez. (Rodriguez Decl., ECF No. 90-10, ¶ 9; Pl.'s Mot. for Protective Order, ECF No. 7, ¶ 3.)

On September 13, 2011, Defendant Killen reviewed an approved Priority Legal User ("PLU") status request from Plaintiff, and then authored another CDC 128B informational chrono for placement in Plaintiff's central file. She stated in the chrono that Plaintiff had manipulated staff to obtain PLU status and access the law library. (Killen Decl. ¶ 12, Ex. D.) About a month later, Defendant Killen wrote another chrono, stating that Plaintiff violated policies by incorrectly returning legal materials, and that Plaintiff had identified her as a "DEFENDANT" on an envelope to "incite and intimidate" her. (Killen Decl. ¶ 13, Ex. E.)

On December 27, 2011, Plaintiff's cell was searched by Officer Gutierrez, a non-party, and some of Plaintiff's property was confiscated. (Confiscated Property Receipt, ECF No. 100, p. 209.) Three days later, on December 30, 2011, Plaintiff entered the Facility D law library and had a verbal exchange with inmate Berry, after which Plaintiff left the library. (Berry Decl. ¶ 15; Pl.'s Dec. 30, 2011 Decl., ECF No. 100, pp. 224-25.)

On January 11, 2012, Plaintiff was transferred from SATF's Level IV-Sensitive Needs Yard Facility D to Ad-Seg due to an investigation. (Tolson Decl., ECF No. 90-12, at ¶ 7, Ex. A.) Plaintiff's initial Ad-Seg review before the Institutional Classification Committee was held on January 19, 2012, and Defendants Fisher, Santoro, and Tolson were not present (Hanson Decl., ECF No. 114, at ¶ 12, Ex. C; Santoro Decl., ECF No. 90-11, at ¶ 9; Fisher Decl., ECF No. 90-6, at ¶ 8; Tolson Decl. ¶ 10.)

///

13

On February 2, 2012, Plaintiff again appeared before a committee regarding his retention in Ad-Seg., and he was retained in Ad-Seg an additional 30-days pending completion of the investigation. (Hanson Decl. ¶ 13, Ex. D; Santoro Decl. ¶ 10.) On March 1, 2012, another hearing was held based upon the investigation, and the committee recommended that Plaintiff be retained in Ad-Seg pending CSR review for a transfer to a different facility. (Hanson Decl. ¶ 14, Ex. E; Tolson Decl. ¶¶ 10 & 12.) Defendants Fisher and Santoro were not present during Plaintiff's March 1, 2012, ICC hearing. (Hanson Decl. ¶ 14, Ex. E; Santoro Decl. ¶ 10; Fisher ¶ 8; Tolson ¶ 10.)

On March 13, 2012, an updated CDC 114D Form was provided to Plaintiff, specifying that he was being retained in Ad-Seg pending a non-adverse transfer because he had a confidential enemy located on Facility D and he could not be released to Facility E based on his custody designation. (Hanson Decl. ¶ 15, Ex. F; Tolson Decl. ¶ 17.) 49. That same day, Defendant Tolson authored a letter to Plaintiff regarding his housing assignment and the committee hearings. (Tolson Decl. ¶ 17, Ex. D.) The letter stated that although the investigation was unsubstantiated, as a result of the investigation Plaintiff "now ha[s] a documented enemy on Facility D and cannot return." (March 13, 2012 Tolson Letter, ECF No. 90-12, p. 20.)

Plaintiff filed an inmate appeal against Defendants Fisher, Tolson, and Santoro on March 11, 2012. (Pl.'s Resp. to Defs.' SUF ¶ 53.) Plaintiff remained in Ad-Seg until he was subsequently transferred to California State Prison at Lancaster.

For ease of understanding, the Court discusses the material disputes regarding the above events in more detail in the analysis section, below.

2.   <u>Analysis</u>

a.   **Retaliation Claims**

Defendants first argue that Defendants Killen, Hampson, Hall, Fisher, Rodriguez, Santoro, and Tolson are entitled to summary judgment in their favor on Plaintiff's First Amendment retaliation claims. "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

14

Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005); accord Watison v. Carter, 668 F.3d 1108, 1114-15 (9th Cir. 2012); Silva v. DiVittorio, 658 F.3d 1090, 1104 (9th Cir. 2011); Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).

       i.      Defendants Killen and Hampson

Defendants argue that Plaintiff's claim that his job reassignment was retaliatory must fail because that reassignment was not motivated by protected conduct. In support, Defendants submit declarations from both Defendants Killen and Hampson that (1) they found Plaintiff difficult to work with; (2) they found that Plaintiff exhibited suspicious and manipulative behaviors; (3) they determined that Plaintiff had developed inappropriate work habits; and (4) they had discussed and worked on reassigning Plaintiff to a different job before Killen submitted the work change application on July 14, 2010. (Killen Decl. ¶¶ 4-6, Hampson Decl. ¶¶ 7-12.) Thus, Defendants assert that the evidence shows that the reassignment process for Plaintiff's job began before he filed any administrative grievance, and it was not motivated by his filing of any grievance.

Plaintiff argues that he has submitted evidence creating a material issue of fact regarding whether his job reassignment was retaliatory. According to Plaintiff, before he was assigned to work under Defendant Killen, he was thought of as a good worker, and even Defendants Killen and Hampson had no documented complaints about him, in contrast to their current declarations discussing problems in working with him. Plaintiff further argues that the evidence shows that once he began to be supervised by Defendants Hampson and Killen, they denied him copy requests for his civil rights appeals and litigation, and then had him assigned to a less-desirable job once he pursued a grievance regarding the denials.

In support of Plaintiff's position, he cites evidence that on January 19, 2010, he was designated as a critical worker for the library for January 2010. (Facility D Staff Memo., ECF No. 100, p. 238.) At the time, Title 15 of the California Code of Regulations, section 3000, provided in relevant part that "critical inmate workers" would be permitted to attend to work assignments under escort during lockdowns. 15 C.C.R. § 3000 (2010.) As a result, Plaintiff argues that his placement on the list of critical inmate workers at that time, when he was supervised by a non-defendant LTA, shows that he was considered a trustworthy worker. Plaintiff also cites a February 2010 Work Supervisor's Report

regarding his job performance, in which his then-supervisor, LTA Hernandez, gave him a score of 3 out of 5 in all job duties (indicating his work was satisfactory), and described him as a "good worker." That report also indicates a recommendation for a job reassignment, and indicates a job assignment change from the literacy clerk job to the law library clerk job. Plaintiff argues that the form reasonably indicates that LTA Hernandez recommended him for a job promotion. (Feb. 12, 2010 Work Supervisor's Report, ECF No. 100, p. 262.) Plaintiff also presents evidence that his job title was changed from literacy clerk to law library clerk on February 13, 2010, the day after LTA Hernandez's report and recommendation. (Time Log, ECF No. 100, p. 363.)

Plaintiff then cites to two copy request forms he submitted on July 6, 2010, when he was working under Defendant Killen:  one for excess pages for exhibits to an inmate appeal, CDCR Form 602, (ECF No. 100, p. 246), and one for excess pages related to a motion in a civil suit, (id. at 247). Both forms show that they were received by Defendant Killen, and the second form contains a notation indicating it was denied by Defendant Hampson. (Id.) Plaintiff's verified third amended complaint also states that Defendant Killen referred to the litigation that he sought to make copies for as a "bullsh— lawsuit against custody staff." (3ACP ¶ 1.)

As noted above, it is undisputed that Plaintiff then submitted a grievance on July 13, 2010 to Defendant Killen complaining about Defendant Hampson's denial of his copy requests, and on July 14, 2010, Defendant Killen submitted the work change application for Plaintiff. Plaintiff also argues that Defendant Killen showed anger toward him when receiving his July 13, 2010 grievance by "giving Plaintiff the finger" when he gave her the grievance. (3ACP ¶ 2.) Finally, Plaintiff submits declarations from two other inmates, Daniel Womack and David Moore, stating that they heard Defendant Killen admit that Plaintiff's job reassignment was due to him filing an appeal against Defendants Killen and Hampson. (Aug. 13, 2011 Womack Decl., ECF No. 110, p. 184-85; Aug. 17, 2011 Moore Decl., ECF No. 100, p. 187.)

Contrary to Defendants' assertions, Plaintiff's evidence is sufficient to create a genuine issue of material fact regarding whether his job reassignment was retaliatory and motivated by his grievance. Defendants Killen and Hampton do not dispute that they worked together on Plaintiff's job reassignment. (Hampson Decl. ¶ 12; Killen Decl. ¶ 6.) And although Defendants submitted evidence

that they had no retaliatory motive, and dispute the inferences to be drawn from the evidence Plaintiff cites, on summary judgment the Court must draw all reasonable inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Here, although there is conflicting evidence and different explanations for Defendants' conduct offered by both sides, a reasonable jury could choose to credit the evidence and explanations offered by Plaintiff. Matters of credibility and believability shall likely be determinative here, and those are issues to be decided by the trier of fact.

Defendants also argue that no reasonable jury would find that a job reassignment would chill Plaintiff's protected speech, because job reassignments regularly occur, and because this job change was based on valid factors. In addition to Defendant Killen's and Hampson's declarations discussing the problems they said they have working with him, they also cite statements they made that length of time in the job, a non-retaliatory factor, was a reason for Plaintiff's termination. (Aug. 24, 2010 First Level Appeal Resp., ECF No. 100, p. 260.)  Nevertheless, as noted above, Plaintiff has presented evidence from which a reasonable jury could find that the job change was retaliation for his protected conduct, if his evidence were found to be credible and his explanations believable. In addition, he has provided some non-testimonial evidence from which a jury could reasonably infer that ordinary work concerns were not the basis for his job change, such as his evidence that other inmates worked at the Facility D library for over two years, whereas he worked there for  about ten months total.

Defendants contend that Plaintiff cannot show his speech was chilled because he continued filing inmate appeals and lawsuits, but Plaintiff is not required to provide evidence that he did not do so to present a triable claim. Speech need not be completely silenced in order to be chilled; the correct inquiry is "whether an official's act would chill or silence a person of ordinary firmness from further First Amendment activities." Rhodes, 408 F.3d at 568-569. Here, Plaintiff's evidence that the allegedly retaliatory job reassignment resulted in a loss in pay and less desirable job duties are sufficient to support a finding by a reasonable jury that an ordinary person would be chilled by Defendants' alleged conduct. See, e.g., Dahlia v. Rodriguez, 735 F.3d 1060, 1079 (9th Cir. 2013) (loss of pay and change of work assignment are adverse employment actions that are reasonably likely to deter employees from engaging in protected activity).

17

Next, Defendants argue that Plaintiff cannot show that the issuance of various chronos against him by Defendants Killen and Hampson were retaliatory, because he cannot show that retaliation was the substantial or motivating factor behind their issuance, and because he cannot show he suffered any adverse action from the chronos. Defendants assert that the chronos were authored to document their observations and concerns about Plaintiff's conduct, which served the legitimate penological goals of documenting his conduct for progressive discipline, establishing behavior patterns, and chronicling harassment by inmates.

Plaintiff disputes the informational and counseling chronos authored by Defendants Killen and Hampson, arguing that they were falsely written in response to his filing of grievances. However, Plaintiff has presented no evidence that these chronos were tied to any adverse action; Plaintiff does not dispute that he was never disciplined for them. Although Plaintiff contends the chronos contain false allegations, such allegations do not constitute adverse action in and of themselves, even if false. See, e.g., Jenkins v. Caplan, No. C 02-5603 RMW PR, 2010 WL 3742659, at *2 (N.D. Cal. Sept. 16, 2010) (granting summary judgment for defendant where plaintiff failed to present evidence that chrono constituted adverse action); Williams v. Woodford, 2009 WL 3823916, *3 (E.D. Cal. 2009) ("[T]he alleged filing of the false administrative chrono fails to state a claim because it is not a sufficient adverse action for a retaliation claim because the chrono was merely informational.") (citing Rhodes, 408 F.3d at 568); Samano v. Copeland, 2008 WL 2168884, *2 (E.D. Cal. 2008) (dismissing retaliation claim for failure to state a claim because issuing a counseling chrono did not constitute an adverse action).

In an attempt to provide evidence supporting a triable claim, Plaintiff asserts that Defendant Hampson authored a chrono on May 20, 2011 to have him re-housed in Ad-Seg, by claiming in the chrono that he was attempting to be "overfamiliar" with Defendant Killen. (May 20, 2011 Info. Chrono, ECF No. 90-8, p. 12.) Defendant Hampson denies the implication of a retaliatory motive, and instead asserts that she merely used the term "overfamiliar" in error. Both Defendant Hampson and Defendant Fisher submit declarations stating that Defendant Hampson was informed by Defendant Fisher that the term "overfamiliar" was not the appropriate term to describe Plaintiff's alleged conduct, and Defendant Hampson drafted a later chrono clarifying that she had used the term

18

"overfamiliar" improperly. (Hampson Decl. ¶ 16; see also Fisher Decl. ¶ 17.) Plaintiff contends that Defendant Hampson in fact knew the use of the term "overfamiliar" has a particular meaning in the prison context that would require his placement in Ad-Seg, making her action an incomplete attempt to retaliate against him that was prevented by Defendant Fisher.

The evidence Plaintiff presents does not support his assertions regarding Defendant Hampson's use of the term "overfamiliar." Plaintiff cites "common knowledge" and his own assertions that everyone who worked in a prison context for a certain time would have known the results of using the term "overfamiliar" regarding an inmate. This is merely speculative and does not raise a material dispute regarding whether Defendant Hampson was aware of the use of the term "overfamiliar," and whether she could have been attempting to retaliate against Plaintiff by using that term in a chrono. Plaintiff also attempts to rely on discovery responses from Defendant Fisher asserting that he understood the particular meaning of "overfamiliar" in the prison context, but this evidence is irrelevant to Defendant Hampson's knowledge. Thus, Plaintiff has not presented sufficient evidence that Defendant Hampson's May 20, 2011 chrono, or any of the other chronos, constituted an adverse action against him. Therefore, he has has failed to meet his burden to provide sufficient evidence of an element of his retaliation claim to the extent it is based on the chronos.

For these reasons, the undersigned recommends that Defendants Hampson and Killen should be granted summary judgment on Plaintiff's retaliation claim to the extent it is based on the issuance of administrative, informational chronos, but not to the extent it is based on his job reassignment.

ii.     Defendants Fisher, Santoro, and Tolson

Defendants assert that Plaintiff's claim against Defendants Fisher, Santoro, and Tolson that he was placed in Ad-Seg and eventually transferred from SATF as retaliation must fail, because he cannot establish causation. Specifically, they argue that since Plaintiff's grievance against Defendants Fisher, Santoro, and Tolson was made after they recommended that he be transferred to Ad-Seg and from SATF, he cannot show that they made such recommendations in retaliation for that grievance.

Plaintiff's claim against Defendant Santoro, however, is broader than Defendants assert. Plaintiff first claims that Defendant Santoro retaliated against him for filing complaints against staff generally, as well as for maintaining this lawsuit, by threatening him with placement in Ad-Seg. In

support, Plaintiff cites evidence that Defendant Santoro was aware of Plaintiff's inmate appeals because Santoro reviewed them as an associate warden. (Appeal Log No. SATF-10-02875, ECF No. 90-4, p. 21; Appeal Log No. SATF-D-11-00328, ECF No. 100, p. 90; Appeal Log No. SATF-D-11-01280, ECF No. 100, p. 105; Appeal Log No. SATF-D-11-02486, ECF No. 100, pp. 126, 131.) Plaintiff also cites his declaration testimony that on August 11, 2011, shortly after he filed this lawsuit on July 18, 2011, Defendant Rodriguez interviewed him. Plaintiff declares that Defendant Rodriguez implied during that interview that "Defendant Santoro had ordered [Rodriguez] . . . to threaten me with Ad-Seg placement if I refused to stop filing complaints and dismiss this instant action." (Pl.'s Sept. 18, 2016 Decl., ECF No. 106, at ¶ 20.) Defendants dispute Plaintiff's version of the August 11, 2011 conversation and whether any threats or orders to threaten actually occurred. Nevertheless, Plaintiff has put forth sufficient evidence of a retaliatory motive that, when taken in the light most favorable to him, raises a genuine dispute regarding whether Defendant Santoro retaliated against Plaintiff because of his grievances and lawsuit. See Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009) (mere threat of placement in Ad-Seg can be an adverse action, regardless of whether it is carried out).

As to Plaintiff's eventual placement in Ad-Seg and transfer from SATF, Defendants argue that Plaintiff cannot show his protected conduct was the substantial or motivating factor behind their conduct. To show the presence of this element on a motion for summary judgment, Plaintiff must put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to the Defendants' intentions in making their recommendations. Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003). Defendants first argue that Plaintiff has not done so, because the evidence they submitted shows that his January 11, 2012 transfer to Ad-Seg occurred because of an investigation into confidential information that he was making threats against inmates. (See CDC Form 114-D, ECF No 90-12, pp. 7-8.)

To undermine Defendants' assertions here, Plaintiff contends that the confidential information came from Defendant Killen's new law library clerk, inmate Berry, that the information was false, and that Defendants knew it was false. Plaintiff further contends that a non-party, Correctional Counsel I Doug Hanson, told him that Defendants Santoro, Tolson, and Fisher conspired to retain him in Ad-Seg

and transfer him in retaliation for his refusals to drop his lawsuit. Plaintiff does not cite sufficient evidence to create a genuine issue of material fact for either of these contentions.

In support of his claim that Defendants Santoro, Tolson, and Fisher understood the confidential information that supported his placement in Ad-Seg to be false, Plaintiff cites evidence that he asserted the information came from inmate Berry and was false, such as declarations, complaints, reports, and other documents he drafted. (ECF No. 100, pp. 211-221, 223-226, 227-33.) But evidence that Plaintiff thought confidential information was false, and told others about his beliefs, does not show that any of the Defendants affirmatively knew the information was false and took adverse actions against him despite that knowledge.

Plaintiff also cites declarations from inmate witnesses and himself in support of his contention that Counselor Hanson told him, furing a conversation on February 15, 2012, that Defendants Santoro, Tolson, and Fisher conspired to retaliate against him. Plaintiff's declaration, however, only testifies that Counselor Hanson stated Plaintiff would be retained in Ad-Seg and eventually transferred from SATF. (Pl.'s Sept. 18, 2016 Decl. ¶¶ 38-40.) It does not state that Counselor Hanson described any basis to infer a retaliatory motive by the Defendants, nor does it state how Counselor Hanson would know what Defendants' motivation was for their conduct. The same is true of the inmate declarations that Plaintiff submitted. (Lester Kelii Decl., ECF No. 100, pp. 343-44; Fernando Gonzales Decl., ECF No. 100, pp. 346-47.) Counselor Hanson also now denies making any such statements that Plaintiff attributes to him. (Hanson Decl., ECF No. 144, ¶¶ 18-25.)

Defendants further assert that Plaintiff's retaliation claim against Defendants Santoro, Tolson, and Fisher must fail because his placement in Ad-Seg and transfer served legitimate penological interests, and Plaintiff cannot show otherwise. The Court agrees that this is an additional reason to grant summary judgment on these claims. Defendants have presented evidence that Plaintiff was retained in Ad-Seg due to the investigation based on the confidential information, and then transferred from SATF based on a documented confidential enemy and other case factors.

To refute this evidence, Plaintiff again relies on his contention that the confidential information was actually false information from inmate Berry that Defendants knew was false. Prison officials who use a valid procedure as subterfuge, a cover, or a ruse to obscure retaliation cannot assert that

their conduct served a valid penological purpose, "even though [the prisoner] may have arguably ended up where he belonged." <u>Bruce v. Ylst</u>, 351 F.3d 1283, 1289 (9th Cir. 2003) (emphasis removed). Here, as discussed above, Plaintiff has presented no evidence that Defendants Santoro, Tolson, or Fisher knew any confidential information was false, or otherwise attempted to abuse valid policies and procedures.

Based on the foregoing, the Court finds that Plaintiff's retaliation claim against Defendants Tolson and Fisher should be dismissed, and his claim against Defendant Santoro should be limited to the allegations that he ordered Defendant Rodriguez to threaten Plaintiff on August 11, 2011.

iii. <u>Defendants Hall and Rodriguez</u>

Defendants also move for summary judgment on Plaintiff's retaliation claim against Defendants Hall and Rodriguez, to the extent it is based on their alleged involvement in his job reassignment. They assert that Plaintiff cannot even show that Defendants Hall and Rodriguez knew of the reassignment, much less that they were involved in that process and acted with retaliatory intent.

The Court agrees that Plaintiff does not present sufficient evidence to raise a genuine issue of material fact here. Defendant Hall has submitted a declaration testifying that he was not involved in the process of reassigning Plaintiff from his law library clerk job, although he became aware of it after it occurred due to his involvement in the grievance Plaintiff filed against Defendants Killen and Hampson regarding the job change. (Hall Decl. ¶ 9.)

To counter this evidence, Plaintiff submits a declaration from an inmate witness which states that the witness heard Defendant Killen claim that Defendant Hall "had [her] back" regarding her request to have Plaintiff's job changed. (Womack Decl. ¶ 5.) Even assuming Defendant Killen made this statement, it is no more than vague innuendo, and does not substantiate Plaintiff's contention that Defendant Hall took an adverse action against him by taking part in his job reassignment for retaliatory purposes. Plaintiff also alleges that after his job reassignment, on August 18, 2010, Defendant Hall told Plaintiff there would be "unfavorable consequences" if he revealed negative information about certain staff. Plaintiff presents no evidence of any actual adverse conduct taken against him by Defendant Hall related to this discussion, nor does he show how sharing information that he claimed to possess about certain staff is protected conduct. In short, no reasonable jury could

find that Defendant Hall either took an adverse action or acted with a retaliatory motive against Plaintiff based on this evidence.

Defendant Rodriguez submitted a declaration stating that he was responsible for work assignments and reassignments at SATF during the time in question, and although he does not recall Plaintiff's job reassignment specifically, he has no recollection of denying any of Defendant Killen's request for reassignment. (Rodriguez Decl. ¶¶ 2, 5, 7.) Plaintiff argues that there is additional evidence that Defendant Rodriguez was aware of and approved Plaintiff's job reassignment in July 2010, and that the reassignment violated certain regulations regarding the procedural requirements for that reassignment. Although it is reasonable to infer from the evidence here that Defendant Rodriguez was involved in Plaintiff's job reassignment, there is no evidence that he did so with any retaliatory motive. Plaintiff cites no evidence that Defendant Rodriguez was even aware of any complaints or other protected activity by Plaintiff at that time.

Plaintiff also contends that Defendant Rodriguez, on Defendant Santoro's orders, retaliated against him on August 11, 2011 when Rodriguez threatened him with Ad-Seg placement for continuing to file complaints and maintaining this lawsuit. For the same reasons discussed above with regard to Defendant Santoro, this evidence is sufficient to establish a triable issue of fact regarding whether Defendant Rodriguez retaliated against Plaintiff by threatening him with adverse actions for his protected litigation activity. Although Defendant Rodriguez denies that he made the threats, (Rodriguez Decl. ¶ 9), Plaintiff's declaration asserts the opposite, (Pl.'s Dec. 30, 2011 Decl. ¶ 20). Which testimony is to be believed must be decided by the trier of fact.

Therefore, the Court recommends that summary judgment be granted in favor of Defendant Hall on Plaintiff's retaliation claim. The Court also recommends that summary judgment be granted in favor of Defendant Rodriguez on Plaintiff's retaliation claim to the extent that it is based on his job reassignment, but that Plaintiff's claim on the alleged August 11, 2011 threats should proceed to trial.

### b.    Conspiracy Claims

Next, Defendants Killen, Hampson, Hall, Rodriguez, Santoro, and Tolson argue that summary judgment should be granted in their favor on Plaintiff's claim for conspiracy to retaliate. A conspiracy claim brought under section 1983 requires proof of "an agreement or meeting of the minds to violate

constitutional rights," Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2001) (quoting United Steel Workers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1540–41 (9th Cir. 1989) (citation omitted)), and an actual deprivation of constitutional rights, Hart v. Parks, 450 F.3d 1059, 1071 (9th Cir. 2006) (quoting Woodrum v. Woodward County, Oklahoma, 866 F.2d 1121, 1126 (9th Cir. 1989)). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." Franklin, 312 F.3d at 441 (quoting United Steel Workers, 865 F.2d at 1541). Plaintiff must show that an actual deprivation of his constitutional rights resulted from the alleged conspiracy. Woodrum, 866 F.2d at 1126.

Regarding Defendants Tolson, Fisher, and Hall, for the reasons explained above, the Court finds that Plaintiff has not provided sufficient evidence showing they took any retaliatory actions against him. Thus, Plaintiff's conspiracy claims against these Defendants fail as a matter of law, and summary judgment should be granted in their favor.

Regarding Plaintiff's claim based on his job reassignment, Defendants Killen and Hampson argue that Plaintiff has presented no evidence that they met with each other and reached an agreement to deprive him of his constitutional rights. On the contrary, Plaintiff raises a genuine issue as to whether they conspired to retaliate against them. Defendants own evidence is that Killen and Hampson discussed whether Plaintiff would continue working with Defendant Killen as a law library clerk, and agreed that Killen should find a different clerk and that she was free to reassign Plaintiff to a different job. (Killen Decl. ¶ 6; Hampson Decl. ¶ 12.) Because there is a genuine dispute of material fact as to whether Defendants Killen and Hampson acted with a retaliatory motive, and whether there were legitimate penological justifications for the job reassignment, there is also a triable issue as to the conspiracy claim against them. See Avalos v. Baca, 596 F.3d 583, 592 (9th Cir. 2010) (§1983 conspiracy claim requires plaintiff to establish an express or implied agreement among the defendant officers to deprive him of his constitutional rights, and an actual deprivation of those rights resulting from the agreement).

For these same reasons, Plaintiff also raises a triable claim as to whether Defendants Rodriguez and Santoro conspired to retaliate against him. As discussed above, Plaintiff has presented sufficient evidence to raise a genuine issue of material fact regarding whether Defendant Santoro met with and

ordered Defendant Rodriguez to threaten him with Ad-Seg placement unless he ceased filing complaints and dropped this lawsuit. Although the evidence of the retaliatory motive here is relatively weak, as it depends on Defendant Rodriguez's alleged admission of such to Plaintiff, which Defendant Rodriguez now denies saying, the question of whose testimony is more credible cannot be determined by the Court on summary judgment.

As a result of the foregoing, Defendants Killen and Hampson, and Rodriguez and Santoro, are not entitled to summary judgment on Plaintiff's conspiracy claim. Thus, the Court recommends that summary judgment be denied in that respect.

### c.   Qualified Immunity

Finally, Defendants argue that, even assuming that the Court finds that Plaintiff has sufficiently established a violation of a constitutional right, they are entitled to summary judgment on qualified immunity grounds. Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In resolving the claim of qualified immunity, the Court must determine whether, taken in the light most favorable to Plaintiff, Defendants' conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001); Mueller v. Auker, 576 F.3d 979, 993 (9th 2009).

While often beneficial to address in that order, the Court has discretion to address the two-step inquiry in the order it deems most suitable under the circumstances. Pearson v. Callahan, 555 U.S. 223, 236 (2009) (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Mueller, 576 F.3d at 993–94. In this instance, the evidence viewed in the light most favorable to Plaintiff demonstrates a constitutional violation by Defendants Killen, Hampson, Rodriguez and Santoro, and there exist triable issues of fact as to whether the right was violated. Therefore, the Court proceeds without further discussion to the second step of the inquiry.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Hamby v. Hammond, 821 F.3d 1085,

1090-91 (9th Cir. 2016) (citations omitted). Although a plaintiff need not find "a case directly on point, . . . existing precedent must have placed the . . . constitutional question beyond debate." Id. at 1091 (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011)). That is, existing precedent must have "placed beyond debate the unconstitutionality of" the officials' actions, as those actions unfolded in the specific context of the case at hand. Id. (quoting Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015)). Hence, a plaintiff must prove that "precedent on the books" at the time the officials acted "would have made clear to [them] that [their actions] violated the Constitution." Id. (quoting Taylor, 135 S. Ct. at 2045.)

Defendants Killen and Hampson argue that because there is no law prohibiting a job reassignment for an inmate from one prison job to another, no reasonable correctional officer would have understood that the job reassignment constituted retaliation. The Court does not find this argument to be persuasive. When "considering whether a defendant is entitled to qualified immunity, the inquiry must focus on the time of the conduct, i.e., whether the officer's acts were reasonable in light of the information he possessed at the time he acted, rather than its aftermath and effect. . . ." Quiroz v. Short, 85 F. Supp. 3d 1092, 1104–05 (N.D. Cal. 2015) (citing Rhodes, 408 F.3d at 570). In the specific context of this matter, Plaintiff claims that in July 2010, Defendants Killen and Hampson intentionally caused him pecuniary and other harm by changing his job assignment because of his filing of a prisoner grievance, rather than any legitimate penological purpose. At that time, it was clearly established that retaliating against a prisoner for his use of the prison grievance system violates a prisoner's constitutional rights. See id. at 1104 (citing Rhodes, 408 F.3d at 567). See also Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995) (the "prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes").

Moreover, it was clearly established at the time at issue here that retaliatory actions violate the Constitution quite apart from any underlying misconduct they are designed to shield, because the rights being protected are the "bedrock constitutional guarantees" of the right to file prison grievances and to pursue civil litigation in the courts. Rhodes, 408 F.3d at 567 (citations omitted). Thus, although Defendants are correct that in general a prisoner does not have a Constitutional right to a specific job, see e.g., Clagett v. Woodring, No. CV 08-6251-JFW-MAN, 2011 WL 7463790, at *14 (C.D. Cal. May

26

31, 2011), Plaintiff's claim that his rights to pursue grievances and litigation were interfered with on retaliatory grounds is still legally cognizable. Thus, viewing the evidence in the light most favorable to Plaintiff, it would have been clear to a reasonable prison official that Defendant Killen's and Hampson's alleged retaliation for Plaintiff's use of the prison grievance system and engaging in civil litigation was unlawful at the time it occurred. The same analysis is true of Plaintiff's claim that Defendant Rodriguez, on orders from Defendant Santoro, threatened Plaintiff with Ad-Seg placement unless he ceased filing complaints and dropped this lawsuit. Consequently, when construing the evidence in the light most favorable to Plaintiff as the non-moving party, the Court does not find that any of the Defendants are entitled to qualified immunity here as a matter of law.[4]

## IV.

## CONCLUSION AND RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.     Defendants' motion for summary judgment, filed June 10, 2016 (ECF No. 90), be GRANTED IN PART, as follows:

    a.     Defendants Tolson, Fisher, and Hall are entitled to summary judgment on all claims, and should be dismissed from this action;

    b.     Defendants Hampson and Killen should be granted summary judgment on Plaintiff's First Amendment retaliation claim, only to the extent it is based on the issuance of chronos;

    c.     Defendant Santoro should be granted summary judgment on Plaintiff's First Amendment retaliation claim, only to the extent it is based on Plaintiff's placement in Ad-Seg and transfer from SATF; and

---

[4]     Plaintiff also brought in his third amended complaint a state law claim for loss of personal property arising out of an alleged retaliatory cell search on December 27, 2011 ordered by Defendant Killen. Defendants present some evidence that the search was not retaliatory, but rather a random search. (Dec. 27, 2011 chrono, ECF No. 90-4, p. 18.) However, Defendants make no argument on summary judgment grounds in their briefing on this claim.

Since the issue is not raised or briefed, and it is not clear if Defendants are even moving for summary judgment on that claim, the Court does not find summary judgment appropriate. Further, Plaintiff has presented contradicting evidence that the cell search resulting in his alleged property loss was retaliatory and ordered by Defendant Killen. (James Ray Decl., ECF No. 100, pp. 322-23; 3ACP ¶ 23; Pl.'s Sept. 18, 2016 Decl. ¶ 26.)

2.        This matter should proceed on the following claims:

   a.        that Defendants Hampson and Killen retaliated against Plaintiff in violation of the First Amendment by having his job reassigned;

   b.        that Defendant Santoro ordered Defendant Rodriguez to threaten Plaintiff with Ad-Seg placement in retaliation for protected conduct in violation of the First Amendment, on August 11, 2011;

   c.        that Defendant Rodriguez retaliated against Plaintiff for protected conduct, in violation of the First Amendment, by threatening Plaintiff with Ad-Seg placement on August 11, 2011;

   d.        that Defendants Hampson and Killen conspired to retaliate against Plaintiff, and that Defendants Rodriguez and Santoro conspired to retaliate against Plaintiff; and

   e.        Plaintiff's state law claim for personal property loss arising out of an alleged retaliatory cell search on December 27, 2011, ordered by Defendant Killen.

   These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:    **March 6, 2017**

UNITED STATES MAGISTRATE JUDGE

28